# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:05CR94** |
| **vs.** | ) | |
| | ) | **REPORT AND** |
| **JOSE ELIAS GARCIA and** | ) | **RECOMMENDATION** |
| **VINCENTE PADILLA-NAVARRO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the court on the MOTION TO SUPPRESS WIRETAP EVIDENCE (#65) filed by Jose Elias Garcia and joined by Vincente Padilla-Navarro (*see* #73). An evidentiary hearing was held on September 9, 2005, the transcript of which (#89) was filed on September 22, 2005. The final post-hearing brief was filed on November 7, 2005, at which time the motion was deemed submitted for decision.

The defendants contest the legality of a wiretap authorization issued by Judge Bataillon on February 17, 2005[1] for cellular telephone numbers 402-210-4446, 402-312-4730, and 562-212-2409. Both defendants assert that the application was not supported by probable cause and that the government did not establish the necessity of a wiretap.[2]

For the reasons discussed herein, I recommend that the defendants' motion be denied.

---

[1]Both defendants withdrew their challenges to a related wiretap authorized on January 18, 2005.

[2]During oral argument, counsel for Jose Elias Garcia also questioned whether the government complied with minimization and sealing requirements. Those arguments were not discussed in Garcia's post-hearing brief (#95) and are deemed abandoned or withdrawn.

## FACTUAL BACKGROUND

G. William Nellis testified he has been employed 17 years by the FBI and is Special Agent assigned to a narcotics task force.  He and Omaha Police Officer Gary Kula conducted an investigation of the defendants, who were suspected of committing offenses involving possession with intent to distribute and distribution of cocaine and methamphetamine; conspiracy to distribute and possess with intent to distribute cocaine and methamphetamine; continuing criminal enterprise; unlawful use of a telephone to facilitate those violations; and money laundering, all in violation of 18 U.S.C. §§ 1956 and 1957, and 21 U.S.C. §§ 841(a)(1), 843(b), 846, 848, 952, 960 and 963.

In conjunction with this investigation, on January 18, 2005, the Assistant U.S. Attorney submitted to Chief Judge Bataillon an APPLICATION FOR THE INTERCEPTION OF WIRE COMMUNICATIONS (Exhibit 1; the "January Wire") for a cellular telephone bearing the number 402-812-1391, Electronic Serial Number (ESN) 06710392610, subscribed to by Noemi Urbina.  The application was approved, and communications to and from (402) 812-1391 were intercepted between January 18, 2005 and February 16, 2005.  Both defendants have withdrawn all challenges to the January 18, 2005 wiretap authorization.

Based, in part, on information obtained pursuant to the January Wire, the Assistant U.S. Attorney submitted to Judge Bataillon another APPLICATION FOR THE INTERCEPTION OF WIRE COMMUNICATIONS (Exhibit 5; the "February Wire") for target telephones

- 402-210-4446, subscribed to by Damian Carrio, Omaha, Nebraska;

- 402-312-4730, subscribed to by Jose Aguilera, Glendale, Arizona; and

- 562-212-2409, subscribed to by Gina Garcia, Long Beach, California.

The application for the February Wire, which was approved by Judge Bataillon on February 17, 2005, was supported by affidavit of Agent Nellis, who advised that the following individuals were being investigated for suspected drug trafficking:

Juan (Last Name Unknown), a/k/a/ "Gallo"
Jose Elias Garcia ("Elias")
Carlos Echeveste-Gama
Juan D. Resendiz, Jr.
Douglas Abel Linares
Individual known as Chilo

Agent Nellis' affidavit advises that "Juan" is a supplier to a large drug trafficking organization that deals in methamphetamine and cocaine. The group under investigation operates in Omaha at the behest of unknown traffickers outside Omaha. The drugs originate in Mexico and are transshipped through Arizona and California. The methamphetamine originates in Mexico and California. The cocaine originates in South America and is shipped into the United States through Mexico.

A cooperating witness (CW#1) identified Douglas Able Linares as CW#1's supplier for methamphetamine and cocaine. Carlos Echeveste-Gama was identified as Linares' supplier. On September 8, 2004, this court authorized a wiretap of 402-612-5957, subscribed to by Jackie Garcia, as that number was identified by CW#1 as used by Linares to sell drugs. This wiretap confirmed that Gama was Linares' supplier and that Juan D. Resendiz, Jr. was used by Gama as a courier between Gama and Linares. Lines subscribed

-3-

to by Resendiz and Gama were subsequently wiretapped.  Based on information obtained on those wiretaps, the line of Gama's girlfriend, Maria Sinecio was tapped.  These wiretaps also led to a wiretap of 402-812-1391, subscribed to by Noemi Urbina.

Conversations intercepted from the numbers subscribed to by Garcia, Resendiz, Sinecio and Urbina revealed a drug distribution network supplied by an individual named "Juan" or "Gallo," with the other targeted interceptees acting as couriers at his direction. According to Agent Nellis' affidavit, Juan had access to and used several different cell phones to facilitate his participation in the drug conspiracy.  Specifically, Juan used Urbina's telephone line, as well as those subscribed to by targets Damian Carrio (402-210-4446) and Jose Aguilera.(402-312-4730).

The following information pertaining to "Juan" was obtained during previously authorized wiretaps and dialed number recorder (DNR) records:

- 10-28-04, 10:45 p.m., from 402-813-9982[3] [Juan] to 402-612-4103 [Resendiz]. Resendiz asks Juan if he had "little glass." Juan replies that he does.  Resendiz tells Juan he needs a "small quarter with the tires and a small quart." Juan tells Resendiz he will let Resendiz have it cheap and will bring it to Resendiz.  The term "little glass" refers to crystal methamphetamine.  The phrase "small quarter with the tires and a small quart" refers to quantities of methamphetamine, but Nellis did not know what those quantities were.

- 10-28-04, 10:50 p.m., from 402-612-4103 [Resendiz]  to 402-813-9982 [Juan, using Urbino's phone].  Resendiz tells Juan, "yes Juanito."  Resendiz tells Juan they are bringing the "tickets." Juan tells Resendiz to call him when the tickets are ready.  The term tickets refers to money and is related to the deal discussed during their 10:45 conversation.  Resendiz appears to be brokering the deal and Juan will not deliver drugs until Resendiz has the money.

---

[3]Urbina's number 402-813-9982 changed to 402-812-1391on December 17, 2004.

- 10-28-04, 10:56 p.m., to 402-512-4103 [Resendiz] from 402-813-9982 [Juan, using Urbino's phone]. Juan tells Resendiz that when Resendiz is ready, Juan will come by. Resendiz replies he wants one separate and three together. Juan replies he will separate them when he gets there. The terms "one separate" and "three together" refer to amounts of illegal drugs. The term "separate them when he gets there" means that Juan intended to bring the drugs to Resendiz in one amount and divide it after he arrives at Resendiz' house.

- 10-28-04, 11:24 p.m., from 402-612-4103 [Resendiz] to 402-813-9982 [Juan, using Urbino's phone]. Resendiz tells Juan "it's here," meaning that the money had arrived. Shortly before this telephone call was made, surveillance units observed two vehicles arrive at Resendiz' home and saw individuals go into the home. Nellis believed those individuals were the ones for whom Resendiz was brokering the drug deal. A short time after this call was intercepted, surveillance units saw a Chevrolet Malibu with Nebraska license plate OKA435, and a red Ford Expedition with Nebraska license plate NEC313, arrive at Resendiz' home. Nellis believed these were the individuals dropping off the illegal drugs to Resendiz. The Nebraska DMV records show that OKA435 is registered to Leonardo Gonzalez-Vargas, 819 South 33rd Street, Omaha, NE and plate number NEC313 is registered to Rosa Garcia, 4005 Nicole Street, Omaha, NE.

- 10-28-04, 11:41 p.m., from 402-612-4103 [Resendiz] to 402-813-9982 [Juan, using Urbino's phone]. Resendiz tells Juan his person is going to take it, but for the next time does not want it so broken up. Juan tells Resendiz it was "the last one there" and the next time Resendiz would "get the first, it will be more whole." Nellis believed the recipient was not happy with the condition of the methamphetamine; it may have been diluted too much. Juan tells Resendiz it appeared that way because it was the last of what Juan had. The next amount would be better because Juan would take it from the brick.

- 11-8-04, 9:56 a.m., from 402-612-4103 [Gama, using Resendiz' phone] to 402-813-9982 [Juan, using Urbino's phone]. Gama tells Juan that yesterday, Gama saw a guy who wanted something. Gama asked Juan if Juan had some they can do something and Gama will call him. Juan replies that he has some. Gama asks if it is the same kind as the last one. Juan says it is, but is better. Gama tells Juan if he can get the money right now, they can do it. Gama will call Juan back. Nellis believed Gama met someone on November 7, 2004 who was interested in buying illegal drugs. Since Juan was in possession of illegal drugs, Gama could call the person he met and set up the deal. Gama first needed to get the money together and after doing so would call Juan.

- 11-9-04, 11:02 a.m., from 402-612-4103 [Gama, using Resendiz' phone] to 402-813-9982 [Juan, using Urbino's phone]. Gama tells Juan to have his man come to Gama's house now. Gama tells Juan that he will wait. Gama also tells Juan that Gama will go over there and immediately call Juan.

- 11-9-04, 11:05 a.m., from 402-612-4103 [Gama, using Resendiz' phone] to 402-813-9982 [Juan, using Urbino's phone]. Gama tells Juan to have his man knock on the door, that Gama will be waiting. Juan tells Gama that his man is out and to give him about a half an hour. At 12:11 p.m., surveillance units near Gama's home (214 South 14th St., Omaha, NE) saw a black Mazda four-door with Iowa license plate 323NPN arrive and one Hispanic male enter Gama's residence. About one minute later, the male left Gama's house in the black Mazda. Based on the telephone calls and surveillance, Nellis believed the Hispanic male in the black Mazda was sent to Gama's house by Juan with illegal drugs. The Iowa license plate 323NPN was registered to Jose Elias Garcia, 409 F Street, Apartment 4, Hamburg, Iowa. At 1:30 p.m., the black Mazda was stopped by officers of the Omaha Police Department's Uniform Patrol Bureau to identify the driver. The driver was identified as Leonardo Gonzalez-Vargas, 819 South 33rd St., Omaha, Nebraska. As the driver attempted to locate insurance information, he provided to the officers numerous documents that were located in the glove compartment. One of the documents was a check stub in the name of Gina Lauree Garcia, Long Beach, California.

- 11-10-04, 4:51 p.m., to 402-216-5033 [Gama, using Sinecio's phone] from 402-612-4103 [Resendiz]. Resendiz tells Gama to write down the number 402-813-9982 [Urbino's original phone number].

- 11-10-04, 4:52 p.m., from 402-216-5033 [Gama, using Sinecio's phone] to 402-813-9982 [Juan, using Urbino's phone]. Gama tells Juan that he tried to get some money but couldn't. Gama asked Juan to front it for now and maybe they can settle quickly. Gama tells Juan he needs a half an orange; to work it and if things work out like they used to, it'll get done. Gama tells Juan he wants to get his hands on some and has someone who wants to sell. Nellis believes this conversation refers to Gama asking Juan to front him some illegal drugs as he has a person interested in buying.

- 1-19-05, 6:51 p.m., to or from 402-812-1391, Urbina's new number. Due to technical difficulties, the direction of the call is unknown. A female, Clara Hernandez, spoke with male believed to be Juan. Clara tells Juan that she was stopped by the police. Juan could be heard talking over another telephone to an unidentified third party. Juan told the person to whom he was speaking to come back to his location. Nellis' affidavit notes that a traffic stop was conducted prior to this call on a vehicle operated by Clara Hernandez.

At the time of the stop, Clara Hernandez provided the officers with the address 6810 Mason Street, Omaha, NE as her home address.

- 11-19-04, 8:02 p.m., from 402-612-4103 [Resendiz] to 509-989-4944 [Juan]. Juan asks Resendiz where Carlos Gama is. Resendiz replies that Gama is home and provides Juan with the number 402-216-5033 [Sinecio's phone] in order to reach Gama.

- 11-19-04, 8:03 p.m., to 402-216-5033 [Gama/Sinecio] from 509-989-4944 [Juan]. Juan tells Gama that he is in Washington State. Gama tells Juan that he has half of it left to return to Juan. Juan tells Gama to try and get rid of it in the next couple of days, if not return it. Juan tells Gama to make arrangements with Juan's brother to give it back. Juan says he will be out of town until after Thanksgiving. Nellis advises that this conversation refers to one half pound of methamphetamine that Gama had given to Linares to sell. Linares was unable to sell it. The brother referred to by Juan is defendant, Jose Elias Garcia.

- 11-3-04, 3:37 p.m., from target phone 402-210-4446 [Juan, using Carrillo's phone] to 402-612-4103 [Resendiz]. Juan asks Resendiz for the number of "the guy." Resendiz gives him the telephone number 402-216-5033 [Gama/Sinecio]. Juan tells Resendiz he has good merchandise and is going to call him right now. Resendiz will call Juan when he needs something. Nellis believed Juan was in possession of good quality methamphetamine and needed to contact Carlos Gama to provide methamphetamine to Gama.

- 11-03-04, 3:39 p.m., from target phone 402-210-4446 [Juan, using Carrillo's phone] to 402-216-5033 [Gama, using Sinecio's phone]. Juan tells Gama that he is at "alas de los." Juan asked Gama how much paper Gama has. Gama replied about two. Gama thinks he will be able to pay all that Gama owes Juan by the end of the week. Nellis believes this conversation refers to monies owed by Gama to Juan. "Alas de los" means "Los Angeles, California."

- 12-3-04, 7:11 p.m., from target phone 562-212-2409 [Jose Elias Garcia, using Gina Garcia's phone] to 402-216-5033 [Gama, using Sinecio's phone]. Gama tells Jose Elias Garcia that "the dude" came by and Gama thinks he will have something for Elias today. Elias asks Gama if he got rid of "that" after all. Gama tells Elias that "the dude" is bringing some money. Gama will check into it later today. Gama asks Elias if Elias is here [in Omaha]. Elias responds that he has been here two or three days. Gama asks if the telephone that Elias is using during this conversation is Elias' number. Elias responds that it is.

-7-

- 12-6-04 from 402-216-5033 [Sinecio's phone] to target phone 562-212-2409 [Gina Garcia's phone]. Voice mail answers, no conversation occurs.

- 12-7-04, 2:21 p.m., from target phone 562-212-2409 [Elias, using Gina Garcia's phone] to 402-216-5033 [Gama/Sinecio]. Elias speaks with Conchita Sinecio, asking for Gama, and Sinecio replies that he is not in. Elias asks if Gama has gone to Mexico as Elias has not seen him lately. Sineco replies that Gama is here [in Omaha]. Elias will try to call Gama later and asks that she tell Gama that he called. Sinecio suggests that Elias call Gama on Resendiz' telephone; however, neither of them can remember the number.

- Regarding target phone 562-212-2409 [Gina Garcia]: On March 11, 2004, Mauro Gonzalez-Escorcia was arrested by officers of the Omaha Police Department's Narcotics Unit. At that time, Gonzalez-Escorcia had in his possession two ounces of methamphetamine and two ounces of cocaine. On March 16, 2004, Miguel Amezcua-Espinoza appeared at the Douglas County Corrections Center (DCCC) and attempted to post bond for Gonzalez-Escorcia. Amezcua-Espinoza appeared to be confused about posting the bond, so DCCC summoned narcotics officers. The officers encountered Amezcua-Espinoza, who told them he had traveled from California at the request of Gonzalez-Escrocia in order to post the bond. Amezcua-Espinoza had $50,000 in currency and told the officers the cash was the proceeds of the sale of a house. He also said he had been given a ride to the DCCC by a friend and that friend was waiting in the parking lot. No charges were filed against Amezcua-Espinoza, and he was released at the scene. Officers identified two people waiting in the parking lot for Amezcua-Espinoza as Julian Mena  and Jose Elias Garcia. After receiving consent to search the vehicle, officers located three cell phones. One with the phone number 562-225-8095 had the name "Elias" on the name banner. Garcia indicated that this was his telephone. A telephone with number 402-813-2259 was also claimed by Garcia. That number was subscribed to by Jose [Elias] Garcia, 409 E. East, Apartment 4, Hamburg Iowa, which is the same address used to register the Mazda suspected of delivering illegal drugs to Resendiz on November 9, 2004. The third cell phone had the number 402-850-0417. The $50,000 was forfeited to the U.S. Government administratively on September 15, 2004. Mauro Gonzalez-Escorcia was indicted in Nebraska, pled guilty to conspiracy to distribute controlled substances and was sentenced to 60 months.[4]

- Regarding target telephone 562-212-2409 [Gina Garcia]: On September 29, 2004, Oscar Noriega-Felix was arrested by the Douglas County Sheriff for possession of 30 pounds of marijuana. He was interviewed by deputies after his arrest and told them that upon

---

[4]*See United States v. Cortes, et al.*, Case No. 8:04CR171, D. Neb.

arriving in Omaha he was to proceed to a gas station near 72nd and Harrison Streets, where he was to telephonically contact "Juan" at 402-212-7681.  A note in Noriega-Felix's shirt pocket had the information "Juan 402-212-7681" and "72nd Avenue and Harrison Street." Noriega-Felix did not wish to make a controlled delivery and did not wish to cooperate further.  Deputies attempted to make a controlled delivery, but no one came to meet the deputy posing as Noriega-Felix at the gas station.  Noriega-Felix was bound over in Douglas County District Court on charges of possession with intent to deliver.  The number 402-212-7681 is subscribed to by Jose Aguilera, 4005 Nicholas Street, Omaha, NE, was disabled at the customer's request on September 30, 2004 and a new number, target phone 402-312-4730, was assigned.

- Regarding target phone 562-212-2409 [Gina Garcia]: On November 21, 2004, officers of the OPD Uniform Patrol Bureau arrested Francisco J. Martinez and Jorge A. Vargas-Amton for possession with intent to deliver after officers found 5 ounces of methamphetamine and $4,000 in their vehicle.  At the time of arrest, Martinez had on his person a cell phone with number 402-714-1342.  Vargas-Amton had a cell phone with number 402-208-4055.  The 4055 number is subscribed to by Joaquin A. Vargas-Altamirano, 6601 S. 36th St., Omaha, NE.  This number appeared in dialed number recorder records ("DNR") for 402-813-9982 [Urbino's phone].  Telephone numbers retrieved from Vargas-Amton's telephone were 402-813-2259 [Jose Elias Garcia, Hamburg, IA] and 402-714-6449 (Jorge Vargas-Amton, 1442 S. 17th St., Omaha, NE).  Number 402-813-2259 [Jose Elias Garcia] has appeared in dialed number recorder records for target phone 402-312-4730 [Aguilera] and target phone 562-212-2409 [Gina Garcia].  The number 402-714-6449 [Vargas-Amton] has appeared in DNR records for target number 402-210-4446 [Carrio].  A telephone number retried from Vargas-Amton's person was 714-743-6194 [Luis N. Castillo, 925 North Claudina, Apt. D, Anaheim, CA].  This number has appeared in DNR records for target phone 402-312-4730 [Aguilera] and target phone 562-212-2409 [Gina Garcia].  Francisco Martinez was bound over in Douglas County District Court on charges of possession with intent to deliver.  On the night of his arrest, Martinez told the officers his supplier was Jorge Vargas-Amton.  Vargas-Amton was charged with possession with intent to deliver.

- Regarding target phone 562-212-2409 [Gina Garcia]: On November 29, 2004, the OPD Gang Unit conducted a traffic stop on a maroon 1996 Ford Taurus.  The vehicle was registered to Leonard Gonzalez, 819 S. 33rd St., Omaha, NE.  The occupants of the vehicle provided telephone numbers 402-210-6022, 402-210-5862 and 402-813-9982 as numbers where they could be contacted.  These numbers have appeared in DNR records for 402-813-9982 [Urbina's phone].  The number 402-210-6022 belongs to Armando L. Ganboa, 6616 S. 36th St., Apt. 2, Omaha, NE.  The occupants of the vehicle brought officers to their residence, 7346 S. 69th St., LaVista, NE, and granted them permission

to search.  The occupants told the officers that the renter of the home was currently in California.  During the search of the residence, OPD Gang Unit officers located items indicative of drug trafficking.  They also located a cell phone bill to Damian Carrio.  The officers went to 6612 So. 36th St., Apt. 2 and made contact with two women.  One told officers she was dating a Hispanic male she knew only as Juan.  She believed Juan was involved in dealing illegal drugs.  She told the officers that Juan was currently in Washington.

Agent Nellis' affidavit further states that on January 15, 2005, CW#1 advised that Juan and Jose Elias Garcia have been distributing cocaine in Omaha for years.  According to CW#1, Juan and Elias are brothers.  Juan has family in Washington state and Elias has family in Los Angeles.  Jose and Juan were recently seen driving a blue Cadillac with Missouri plate 888WRY.

On January 20, 2005, CW#1 advised that Juan  was using Carillo's phone, 402-210-4446, Elias was using Gina Garcia's phone, 562-212-2409, and Juan and Elias may be residing at 6810 Mason Street.  On January 21, 2005, officers observed two vehicles in the driveway of 6810 Mason, one of which was a Cadillac with Missouri plate 888WRY.  The Cadillac was owned by Avis Rental Corp. and reported stolen on January 13, 2005.  Surveillance units followed the Cadillac, operated by Jose Elias Garcia, to the area of 25th and L Streets.  Uniformed officers were called to tow the vehicle.  As officers were waiting for a tow truck, Elias was seen exiting a nearby building talking on a cell phone.  Elias approached the officers and identified himself.  He was told by the officers that Avis had reported the vehicle stolen and that Elias should contact Avis to straighten the matter out.  The vehicle was towed to the OPD impound lot at 7800 F Street.  Officers conducted an

-10-

impound search and found two Sprint PCS cellular telephone receipts dated January 12, 2005 for Carrio's telephone, 402-210-4446, and Aguilera's telephone, 402-312-4730. Nellis stated he believes Elias was using one of the telephones at the time his vehicle was towed. He also believes Juan used one of these telephones when he spoke with Clara Hernandez on January 19, 2005, when she was stopped by OPD.

On January 31, 2005, a second cooperating witness (CW#2) advised that CW#2 was in a position to purchase methamphetamine from an individual CW#2 knew only as "Chilo," over phone number 402-216-1859. On that day, at the direction of law enforcement, CW#2 made a consensually monitored telephone call to Chilo at 402-216-1859 and ordered a quantity of methamphetamine. After the call was made, surveillance officers observed an Hispanic male, later identified by CW#2 as Chilo, leave 6810 Mason and proceed to CW#2's location. CW#2 provided Chilo with U.S. Currency for the methamphetamine. Chilo then left CW#2 and returned to 6810 Mason. A short while later, Chilo and CW#2 engaged in a series of telephone calls during which CW#2 was told by Chilo to proceed to another location where the methamphetamine would be delivered to CW#2. After arriving at the location, CW#2 called Chilo at 402-216-1859. Chilo told CW#2 that a female was waiting for him at the location. After this telephone call, CW#2 identified a vehicle to surveillance officers as a vehicle known to be driven by Chilo. At this time, CW#2 was accompanied by an undercover officer. The undercover officer made contact with the female and received the

methamphetamine.  The following day, the methamphetamine received from the female was taken to the forensic laboratory for testing.  It tested positive for methamphetamine.

Chilo's telephone number, 402-216-1859, has appeared in DNR records for the target telephones registered to Jose Aguilera and Gina Garcia.

Agent Nellis' affidavit continues with a report of the dialed number analyses for the three target telephones, demonstrating links among the target telephones themselves and their links with the telephones registered to Urbina, Gama, Sinecio, Jose Elias Garcia, Castillo, Resendiz, Vargas-Amton, and "Chilo."  Based on these call patterns, Nellis believed that Juan had access to and utilized target phones registered to Carrio and Aguilera to facilitate his role in the drug conspiracy.  Nellis believed that Jose Elias Garcia used the target phone registered to Gina Garcia to facilitate his role in the drug conspiracy.

As to the need for a wiretap, Nellis' affidavit advised that normal investigative techniques were being used, and some have been successful.  Others have failed, appear to be unlikely to succeed, or appear too dangerous to attempt.  Although CW#1 had a relationship with Linares, CW#1 did not have any type of relationship with Juan, Jose Elias Garcia, Echeveste-Gama, or Resendiz.  CW#1 advised that recently Gama requested CW#1's telephone number from Linares; however, Linares refused to give the number to Gama.  CW#1's information was helpful but did not provide the full scope of the conspiracy or the identities of all involved.  There were no other persons providing information regarding this conspiracy.

-12-

Nor did Nellis believe interviews would be successful because the only persons knowledgeable about the conversations and transactions were subjects of the investigation. Such individuals, prior to indictment or arrest, are often not willing to testify in grand juries or criminal trials for fear of retaliation. Interviews of drug dealers and their customers are generally not productive because of their own culpability. There have been no seizures of drugs or monies, no traffic stops involving these individuals, or search warrants executed.

The Assistant U.S. Attorney had advised that a Federal Grand Jury investigation would probably not be successful because the subjects would most likely invoke their Fifth Amendment privilege; it would be unwise to seek immunity for subjects of this investigation, as it might foreclose prosecution of the most culpable persons and could not ensure truthful testimony; and service of Grand Jury subpoenas on the principals or co-conspirators would only alert them to the existence of the investigation.

Law enforcement continue to conduct physical surveillance of Juan, Jose Elias Garcia, Carlos Echeveste-Gama and Juan D. Resendiz, Jr.; however, surveillance has proven to be difficult due to the individuals' erratic driving, counter surveillance measures, and willingness to evade the police. According to Agent Nellis, surveillance, even if highly successful, rarely succeeds in gathering evidence of the criminal activity under investigation. For example, on October 4, 2004, surveillance units followed Gama for an extended period of time and saw him traveling faster than the normal flow of traffic and then suddenly slowing down below the normal flow of traffic. They noted that Gama parked his vehicle

in parking lots and watched vehicles as they passed by him.  He was trying to determine if he was being followed by officers.  They terminated surveillance on Gama due to his erratic driving behavior.

Officers conducted surveillance on Juan on November 10, 2004.  They attempted to conduct a traffic stop, but were unsuccessful because Juan was able to elude surveillance and a marked OPD cruiser.

In this investigation, surveillance would be most useful in corroborating information received electronically.  As to less intrusive means of investigation, reviewing monthly call details and toll records from the target phone s would only provide circumstantial evidence that a phone is or was used and that contact was made between two telephones.  These records do not identify the individuals actually making or receiving the calls and do not indicate the nature of the communications.  Law enforcement will continue to use court-authorized dialed number recorders, but that technique has limitations.

As to the use of undercover agents, an undercover agent was introduced to Linares by CW#1, but Linares made no attempt to introduce CW#1 to Gama or Resendiz and has never made an introduction.  After an undercover OPD officer made a payment to Linares, Linares accused CW#1 and the officer as working for the police.  Thus, the use of another officer may jeopardize the investigation.

On June 2, 2004, officers pulled trash from 3049 S. 19th St., a residence thought to be occupied by Resendiz.  The trash pull revealed no venue to Resendiz and nothing

-14-

indicative of drug trafficking was found. CW#1 advised that this address was a possible stash location. According to Agent Nellis, a trash pull only provides probable cause for the address from which the trash was taken and will not usually identify the full scope of criminal activity or identify co-conspirators.

Agent Nellis did not believe search warrants would provide sufficient evidence to determine the full scope of criminal activity, identify co-conspirators, or show the methods used to purchase, transport, store and distribute the drugs. Search warrants would be more likely to compromise the investigation by alerting the principals.

Based on information received from the four wiretaps previously authorized, investigators believe that Juan, Jose Elias Garcia, and others, are responsible for importing large amounts of cocaine and crystal methamphetamine into the Omaha area. The four wire intercepts have been successful in identifying persons responsible for the sale of cocaine and crystal methamphetamine in Omaha, but these wire intercepts and related surveillance have not assisted in physically identifying Juan, Jose Elias Garcia, and their suppliers.

Finally, the affidavit assured that any intercepted calls involving the target telephones would be minimized as required by law. Agent Nellis testified that a "minimization meeting" is a meeting held by the officers and agents in an investigation to give a briefing on the overall matter of the case as well as to provide minimization instructions and clarify any questions from anyone who may listen to the wire intercepts. They held such a meeting on February 17, 2005 regarding the intercepts on the three numbers authorized in the February

-15-

Wire. The wiretap was activated that day, after the minimization meeting. Two minimization meeting were held, one for day shift, and one for night shift officers. The participating officers were very familiar with minimization instructions because of past wiretaps. Nellis and Officer Kula went over what is allowed to be listened to and what is not; when certain calls need to be minimized and who the named interceptees would be. The officers would then know who they could listen to longer than others. Exhibit 11 is a copy of the minimization instructions. Nellis did not read them verbatim, but touched on privileged conversations and the point that there is no difference between monitoring and recording. Nobody asked him any questions during the minimization meetings.

Exhibit 12 is a roster of persons who attended the minimization meetings. The first page includes the evening shift officers. The second sheet lists the day shift officers. The officers were asked to sign the roster to make sure they were familiar with the minimization instructions "in the event they would have to sit in the Title III[5] room." Exhibit 13 is a sign-in sheet kept in the Title III room, along with the application, order, affidavit, order to the service provider, and minimization instructions. All persons who enter the room for the purpose of listening to the telephone calls were required to read these materials and sign the sheet. Nellis testified on cross-examination that 80 to 90 percent of the calls were in Spanish. The calls were translated contemporaneously with the interception. One of the interpreters is a retired law enforcement officer and one was not an officer. Both interpreters are certified

---

[5]*I.e.*, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. A "Title III" is a wiretap.

by the FBI and were always assisted by a sworn officer in the room with them.   The interpreters also attended the minimization meetings.

Agent Nellis testified that he participated in sealing the phone calls for numbers 402-212-4446 and 402-312-4730.  He presented the optical disk and CD for each of these lines on March 4, 2005 to Judge Bataillon.  He had a CD and an optical disk for each phone line, and they were presented to the judge in two separate envelopes.  He received the CDs and optical disks on March 4, 2005 at 2:20 p.m.  He took them to the electronic surveillance person to be logged in.  The envelopes and chain of custody forms were completed. When he presented the items to Judge Bataillon, the envelopes were sealed.  They were not opened again until he was present to verify the contents.  They were re-sealed and given to the Clerk of the Court, who then executed a receipt for the materials.

Agent Richard Heideman testified that he has worked for the FBI for 29 years and is assigned to the narcotics task force.  He was not the case agent in this investigation but was called in to assist Agent Nellis in the sealing of materials obtained from the wiretap on 562-212-2409.  Heideman testified that he received the optical disk and CD on March 16, 2005 at 9:30 a.m. from one of the FBI's technical agents who set up the interception equipment. The wiretap had been shut down by the time he received the optical disk and CD; removing these items from the machine shuts down the wire.  About five minutes after receiving the items from the technician, he took them to a woman in the FBI office who handles all the tapes, CDs and intercepting mechanisms.  She prepared an envelope to seal the items and

maintained custody of them in a locked room until he asked for them to bring them to the court. He asked for the items at 8:30 a.m. on March 17, 2005. Between 8:30 a.m. and 4:30 p.m., the items were in his possession in a sealed envelope. He took the envelope to Judge Bataillon and handed him the envelope so he could look at the items inside. The judge accepted the items, at which time they sealed the envelope and gave the sealed envelope to the Deputy Clerk. The Deputy Clerk then executed a receipt (Exhibit 10).

## LEGAL ANALYSIS

### A. STANDING

Standing is uncontested. The government agrees that Jose Elias Garcia and Vincente Padilla-Navarro both have standing, as "aggrieved persons," *see* 18 U.S.C. §§ 2510(11) & 2518(10)(a)[6], to contest the legality of the February Wire because their telephone calls were intercepted pursuant to that wiretap. In fact, prior to intercepting the calls, law enforcement had no knowledge of Padilla-Navarro.

---

[6]18 U.S.C. 2518(10)(a) provides, in part:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that–
(i) the communication was unlawfully intercepted;
(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
(iii) the interception was not made in conformity with the order of authorization or approval.

-18-

## B.  WIRETAP AUTHORIZATION

A federal judge may issue an order authorizing or approving the interception of wire

or oral communications, upon a proper application of the United States. 18 U.S.C. § 2516(1).

Title III requires that the application (a) identify the applicant for the interception order; (b)

detail the factual basis for issuance of the order, including details about the offenses under

investigation, a description of the facilities where the communications are to be intercepted,

a description of the type of communication to be intercepted, and the identities of the

interceptees; (c) state why normal investigative procedures would be unsuccessful; (d) state

the time the interception would be in effect; (e) describe prior applications; and (f) describe

the results of the interception, when application is made for an extension of the order. 18

U.S.C. § 2518(1)(a)-(f).  *See, e.g., United States v. Harvey*, Case No. 4:02CR482, 2003 WL

22052993 at *16 (E.D. Mo.,  July 28, 2003).

> The judge may issue the order upon determining that (1) there is probable cause to believe that an individual is committing, has committed, or is about to commit one of the crimes described in 18 U.S.C. § 2516; (2) there is probable cause to believe that particular communications concerning the offense will be obtained through such interception; (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and (4) there is probable cause to believe that the facilities or the place from which the communications are to be intercepted are being used, or are about to be used, in connection with the commission of the offense, or are connected with the subject individual.

*United States v. Harvey*, 2003 WL 22052993 at *17  (citing 18 U.S.C. § 2518(3)(a)-(d) and

*United States v. Milton*, 153 F.3d 891, 895 (8th Cir. 1998), *cert. denied*, 525 U.S. 1165

(1999)).  "Every such interception order must contain a provision requiring the government

to minimize the interception of communications unrelated to the illegal activity specified in the application." *Id*. (citing 18 U.S.C. § 2518(5) and *United States v. Fairchild*, 189 F.3d 769, 774 (8th Cir.1999)).  Wiretap orders are valid for no more than 30-day intervals.  *See* 18 U.S.C. § 2518(5).

The remaining issues are whether there was probable cause to authorize the February Wire and whether a wiretap was necessary in this instance.

### 1. *Probable Cause*

The probable cause required for allowing electronic interception of wire communications is the same as that required by the Fourth Amendment for a search warrant. *United States v. Macklin*, 902 F.2d 1320, 1324 (8th Cir. 1990), *cert. denied*, 498 U.S. 1031 (1991); *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir.), *cert. denied*, 488 U.S. 932 & 960 (1988).  To demonstrate probable cause for the wiretap, the affidavit must include facts which would allow the issuing judge to find (1) that an individual had committed or was about to commit a particular offense, (2) that communication relating to that offense would be intercepted, and (3) that the telephone was being used in connection with that offense or was commonly used by those whose communications were to be intercepted.  *United States v. Milton*, 153 F.3d at 894.  The duty of the reviewing court is to ascertain that the judge issuing the order had a "substantial basis for ... conclud[ing]" that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

-20-

The contents of Agent Nellis's lengthy affidavit are summarized above.  The court agrees with the United States that the affidavit contains abundant probable cause describing the offenses being committed, the facilities or places from which the interceptions were to occur, the types of communications to be intercepted, and the identity of persons to be overheard.

### 2. *Necessity*

18 U.S.C. § 2518 requires that all wiretap applications contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  In *United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir.), *cert. denied*, 513 U.S. 1031 (1994), the Court of Appeals observed that the statute "requires a showing of necessity 'to insure that wiretaps are not routinely employed as the initial step in an investigation.' ....  Even if conventional techniques have been somewhat successful, however, a wiretap may still be authorized." (Citing *United States v. O'Connell*, 841 F.2d 1408, 1415 (8th Cir.), *cert. denied*, 487 U.S. 1210 (1988), and 488 U.S. 1011 (1989)).  "Although Section 2518(1)(c) requires that other investigative techniques be used first, it does not require that officers exhaust those techniques before applying for a wiretap."  *Id.* (citing *Macklin*, 902 F.2d at 1326); *accord United States v. Thompson*,  210 F.3d 855, 858-59 (8th Cir. 2000), *cert. denied*, 532 U.S. 996 (2001).

As discussed above, Agent Nellis' affidavit discusses at length the other investigative techniques that have been or could be used in this investigation. While the defendants dismiss Nellis' information as "boilerplate," the affidavit does, in fact, persuasively demonstrate why "normal" investigative procedures would be inadequate and unsuccessful in this case.

## C.  GOOD FAITH EXCEPTION

As noted above, the probable cause required for allowing electronic interception of wire communications is the same as that required by the Fourth Amendment for a search warrant. Accordingly, I also find that the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), should apply in this instance. In *Leon*, the Supreme Court recognized that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." 468 U.S. at 916. Accordingly, evidence obtained pursuant to a warrant should not be excluded where the officers executed the warrant "with an objectively reasonable reliance on the magistrate's determination of probable cause." *See United States v. Riedesel*, 987 F.2d 1383, 1391 (8th Cir. 1993). Reliance on this wiretap authorization was objectively reasonable.

## RECOMMENDATION

**IT IS RECOMMENDED** that the MOTION TO SUPPRESS WIRETAP EVIDENCE (#65) filed by Jose Elias Garcia and joined by Vincente Padilla-Navarro be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within

-22-

ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED December 8, 2005.**

                              **BY THE COURT:**

                              **s/ F.A. Gossett**
                              **United States Magistrate Judge**